**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IBIS OLIVA** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL J. ASTRUE** | : | |
| **Commissioner of** | : | **NO.  10-2616** |
| **Social Security** | : | |

## AMENDED MEMORANDUM OPINION

**Savage, J.**                                                  **September 29, 2011**

In this social security case, Ibis Oliva requests review of the Administrative Law

Judge's ("ALJ") decision to deny her benefits.  She asserts three grounds for remand of

the ALJ's decision: (1)  the ALJ's decision that her depressive disorders are not *per se*

disabling under Section 12.04 is not supported by substantial evidence; (2) the ALJ erred

in rejecting the opinion of her treating therapist; and, (3) the hypothetical posed to the

vocational expert failed to include all the limitations the ALJ had found.

At the time of the ALJ's decision, Oliva was a 37 year old Cuban immigrant.  She

arrived in the United States as a teenager with a depressive disorder following a period of

sexual abuse.  On October 12, 2006, she filed for supplemental security income under Title

XVI of the Social Security Act claiming that a significant mental impairment limited her

ability to maintain gainful employment.  The ALJ determined that Oliva suffered from a

severe impairment, a major depressive disorder; but this impairment neither constituted a

*per se* disability under Section 12.04 nor limited her residual functional capacity ("RFC")

to perform her past work.

**Standard of Review**

On judicial review, the court determines whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §§ 405(g); 1383(c)(3); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate.'" *Thomas v. Comm'r of Soc. Sec. Admin.*, 625 F.3d 798, 800 (3d Cir. 2010) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)).  The examination for substantial evidence "'is not merely a quantitative exercise.'" *Lozada v. Barnhart*, 331 F. Supp. 2d 325, 328 (E.D. Pa. 2004) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

To facilitate meaningful judicial review, the "'administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests.'" *Barren Creek Coal Co. v. Witmer*, 111 F.3d 352, 355 (3d Cir. 1997) (quoting *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981)).  Thus, the ALJ must "discuss 'the evidence he considered which supports the result' and 'the evidence which was rejected . . . and should give his reasons for accepting only some evidence while rejecting other evidence.'" *Becker v. Comm'r of Soc. Sec. Admin.*, No. 10-2517, 2010 WL 5078238, at *5 (3d Cir. Dec. 14, 2010) (quoting *Cotter*, 642 F.2d at 705).

**Discussion**

To qualify for SSI benefits, a claimant must demonstrate that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A).  A claimant

2

is considered unable to engage in substantial gainful activity if her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review of an SSI claim involves a five-step sequential analysis. 20 C.F.R. § 416.920. The ALJ must first determine whether the claimant is engaged in substantial gainful activity. If she is not, the ALJ next decides whether the claimant suffers from a severe impairment or a combination of impairments that is severe. If so, the ALJ evaluates whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404, subpt. P., appx. 1, resulting in a presumption of disability. If the claimant's impairment does not meet or equal the criteria for a listed impairment, the ALJ must determine whether, despite her impairment, the claimant retains the RFC to perform her past work. If the claimant cannot perform her past work, the ALJ must then decide whether she can perform any other work that exists in the national economy. 20 C.F.R. § 416.920(a)(4); *Allen v. Barnhart*, 417 F.3d 396, 401 n.2 (3d Cir. 2005).

Listing 12.04 Affective Disorder Disability

Oliva's first challenge is to the ALJ's determination at step three that her impairment did not meet the diagnostic criteria of Listing 12.04 to be considered a *per se* disability. Listing 12.04 sets forth the requirements for establishing a *per se* affective disorder disability. It reads:

12.04 Affective Disorders: Characterized by a disturbance of

3

mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.[1]

. . .

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of one of more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

---

[1] The parties concede that Oliva satisfies the criteria of subsection A.

4

20 C.F.R. § 404, subpt. P., App. 1, § 12.04.

> 1. Activities of Daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.  In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

§ 12.00(C)(1).

> 2. Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.

> . . .

> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

§ 12.00(C)(2).

> 3. Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.
>
> . . .
>
> We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.
>
> We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function.

§ 12.00(C)(3).

In determining whether the ALJ "considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing," we must examine the decision as a whole. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). An effective review cannot be performed unless the ALJ's decision reveals an analysis of the entire record and contains specific findings of fact to support the ALJ's conclusions. *Jones*, 364 F.3d at 504. Conclusory findings are insufficient. *Id.* (citing *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119-20 (3d Cir. 2000)). Instead, the ALJ must explain her findings at the third step by citing the evidence supporting her decision and the evidence she rejected with an explanation of why she rejected it. *Id.* at 120.

6

Here, the ALJ provided only summary conclusions concerning Oliva's status at step three, stating that "the claimant's mental impairment does not meet or medically equal the criteria of Listing 12.04."  Explaining that a "marked limitation means more than moderate but less than extreme," the ALJ concluded that "in activities of daily living, the claimant has mild restrictions; in social functioning, she has moderate difficulties; and regarding concentration, persistence, or pace, I find she has moderate difficulties."  The ALJ provided no more discussion of the paragraph B criteria or the medical evidence presented by Oliva at this stage of her analysis.  Later, in determining Oliva's RFC, the ALJ returned to the listing analysis, stating "[t]he medical evidence is scant, at best.  There is nothing in the record to support that the claimant's depression meets or medically equals the diagnostic criteria of Listing 12.04; there is nothing to suggest that she has any disabling vocational limitations as a result of her mental impairment."

The record included three years of psychotherapy notes from Oliva's therapist at Asociacion de Puertorriquenos en Marcha, Inc. (APM) that the ALJ did not address.  These treatment records contain evaluations and descriptions that seem to contradict the ALJ's conclusion that Oliva's impairment did not satisfy the medical criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix I.  These entries in the medical record are:

> October 5, 2005 - "anxious"; "fearful"; "depressive"; with "preoccupations"; "less stable"; "continu[ing] to be depressed and insomniac"; having "been in treatment since childhood"; "preoccupied"; "liv[ing] with an aunt"; and experiencing "bad dreams; nightmares; . . . auditory hallucinations."
>
> November 2, 2005 - "less anxious but continues to have fear of going out.  Her hallucinations have decreased some but [they still] bother her"; "worried"; "anxious"; "fearful"; and with

"preoccupations."

January 25, 2006 - "doesn't go out with anyone.  She prefers to be alone"; "sad"; "anxious"; "fearful"; "depressive"; and "less stable."

March 29, 2006 - "anxious and lonely"; "[s]he doesn't leave the house"; "anxious"; "worried"; and with "preoccupations."

May 24, 2006 - although "[s]he is calmer, she is still isolated but occasionally sees her Cuban friend.  She is fearful of going out.  She was fearful about past trauma (sexual)"; "anxious"; "fearful"; and with "preoccupations."

July 19, 2006 - "she still hears voices on occasion"; "fear[] of going out by herself"; "anxious"; and with "preoccupations."

March 7, 2007 - "she doesn't go out at all"; "she cleans [and] cooks somewhat."

May 2, 2007 - "she doesn't feel well"; "she thinks of bad events in her past life"; she just stays in bed"; "she doesn't go out"; "worried"; "anxious"; "depressive."

October 7, 2007 - "preoccupations with stated depression."

October 17, 2007 - "she stays alone"; "she makes sandwiches but doesn't like to cook."

October 20, 2007 - "sad"; "preoccupied"; "anguished"; "melancholic"; "irritable."

November 6, 2007 - "stress"; "difficulty with appetite"; "sad"; "anguished"; "preoccupied"; "tension"; "frustrated."

April 9, 2008 - "very depressed"; "argumentative"; "irritable"; "anxious."

May 15, 2008 - "very sad"; "anguished"; "melancholic"; "argumentative"; "anxious."

June 2, 2008 - "argumentative"; "irritable"; "very anxious"; "depress[ed]"; "lack of motivation."

June 17, 2008 - "sad"; "distant"; "lost in thought";

> "argumentative"; "anxious"; "depress[ed]."
>
> June 25, 2008 - "she continues to withdraw and isolate from others"; "anxious."

In her decision, the ALJ dismisses this evidence, stating that "the medical evidence is scant, at best."  She rejects the opinion of Oliva's psychotherapist because "it is inconsistent with the record as a whole, and internally inconsistent as 'marked' functions limitations would not be conducive with 'moderate' or 'some serious symptoms'."  This conclusion may be correct.  However, we cannot make that call because the ALJ did not explain and point out the inconsistencies she found.

An ALJ must present the reasoning behind her decision.  *Cotter*, 642 F.2d at 706. If an ALJ rejects probative evidence, she must explain her reasons for doing so.  *Johnson v. Comm's of Soc. Sec.*, 529 F.3d 198, 203-04 (3d Cir. 2008).  In determining that Oliva has mild restrictions in activities of daily living, the ALJ does not mention Oliva's isolation, lack of motivation, and continuous preoccupations.  The ALJ's determination that Oliva suffers moderate difficulties with social functioning is at odds with the therapeutic notes that Oliva was "[afraid] of going out," "prefers to be alone," "isolated" and not "want[ing] to leave her home."  Similarly, the ALJ determined that Oliva experienced only moderate difficulties with concentration, persistence or pace without discussing her continuous anxiety, preoccupations, and auditory hallucinations.  The ALJ's conclusory statements regarding the degree of Oliva's impairments, without any analysis of her therapy history or explanation for her rejection of it, do not provide a basis for conducting a meaningful review.  In short, we cannot determine if the ALJ's conclusions were supported by substantial evidence.

The Commissioner counters that the ALJ's conclusion is supported by the record, citing various areas in Oliva's medical record.  However, the "'grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'"  *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).  Because the ALJ did not appear to rely on these entries in Oliva's treatment record, they are irrelevant to our substantial evidence review.  *See Keiderling v. Astrue*, No. 07-2237, 2008 WL 2120154, at *3 (E.D. Pa. May 20, 2008) ("[I]t is well-established that '[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision'; the Commissioner may not offer a post hac rationalization.") (quoting *Newton v. Apfel*, 209 f.3d 448, 455 (5th Cir. 2000)).  A reviewing court cannot analyze the record to rewrite the decision.  It can only apply the substantial evidence test to the ALJ's decision.  What we may see as dispositive may not have formed the basis for the ALJ's decision.  Conversely, what evidence we see as inconsequential may have been dispositive to the ALJ.  As long as the ALJ specifically explains her reasoning and substantial evidence exists to support it, we cannot disturb it even though we would have decided it differently.

Treating Psychotherapist

Oliva claims that the ALJ erred in disregarding the functional assessment performed by her treating psychotherapist, Luz Vazquez.  Social Security disability regulations distinguish between "acceptable medical sources" and "other sources."  *See* 20 C.F.R. 404.1513.  They do so for three reasons: "[f]irst, we need evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment.  Second, only 'acceptable medical sources' can give us medical opinions.

10

Third, only 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight."  SSR 06-03p, 2006 WL 2263437 (Aug. 9, 2006) (citations omitted).

Psychotherapists are considered an "other source."  20 C.F.R. 404.1513(d) ("Other sources include, but are not limited to . . . therapists.").  Because so called "other sources" have taken on a greater role in treating and evaluating patients, their opinions are deemed "important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file."  SSR 06-03p, 2006 WL 2263437, at *45596.  Thus, "other sources" medical evidence is evaluated using the same criteria by which the ALJ weighs "acceptable medical source" evidence.

Those considerations are:

> How long the source has known and how frequently the source has seen the individual;

> How consistent the opinion is with other evidence;

> The degree to which the source presents relevant evidence to support an opinion;

> How well the source explains the opinion;

> Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

> Any other factors that tend to support or refute the opinion.

Id.; 20 C.F.R. 404.1527(d); 20 C.F.R. 416.927(d).

The opinion of an "other source" is not necessarily entitled to less weight than that of a "medical source."  "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an

'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source."  SSR 06-03p, 2006 WL 2263437, at *45596.  Given the increased role of the "other sources" in claimant's treatment, the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion . . . allows a . . . subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  Id.

Oliva's therapist, Luz Vazquez, who saw Oliva over the course of a year, identified twenty-one symptoms of mental functional disability: "memory difficulties"; "appetite disturbance"; "sleep disturbance"; "social withdrawal or isolation"; "delusions and/or hallucinations"; "obsessions or compulsions"; "feelings of guilt/worthlessness"; "persistent irrational fears"; "generalized persistent anxiety"; "personality change"; "disorientation"; "mood disturbance"; "emotional lability"; "decreased energy"; "panic attacks"; "anhedonia or pervasive loss of interests"; "paranoia or inappropriate suspiciousness"; "difficulty concentrating or thinking"; "hostility or irritability"; "illogical thinking"; and "intrusive thoughts of traumatic event(s)."   Vazquez noted that Oliva suffered marked limitations in understanding and memory; sustained concentration and persistence; social interaction; and adaptation.

As for her adaptive functioning evaluation, Ms. Vazquez determined that Oliva suffered from "major depressive disorder" and "bipolar disorder."  She noted that Oliva experienced physical ailments such as asthma, migraines, diabetes, and joint and back pain.  She also noted that she had "no family support."  She assigned Oliva a Global Assessment of Functioning ("GAF") score of 60.  Her clinical findings were that Oliva

"show[ed] history of major depression recurrent with hallucinations (psychotic symptoms) - with wave of panic" and "is unable to sustain a job or daily functioning." Vazquez's prognosis for Oliva was "poor" and she opined that Oliva "is unable to sustain a part-time or full-time job due to her chronic mental condition."

Vasquez, who is not a physician or psychiatrist, and is deemed an "other source" whose opinions are not entitled to "controlling weight," offers medical opinions in the form of diagnoses. She opines that Oliva suffers from "major depression disorder" and "bipolar disorder." She is not qualified to make these diagnoses. Indeed, Social Security Ruling, SSR 06-03p, cautions that information from "'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose." Nevertheless, opinions of "other sources" regarding impairment severity and functional effects must be evaluated with the relevant evidence in the case.

The ALJ's treatment of Vasquez's assessment reads:

> As for the opinion evidence, I afford no weight to the opinion at Exhibit 5f, as the opinion states all "marked" functional limitations, yet the form itself notes a GAF of 60 and records note GAF's in the range of 60-65. The opinion is inconsistent with the record as a whole, and internally inconsistent as "marked" functional limitations would not be conducive with "moderate" or "some serious symptoms."

The ALJ did not substantively evaluate Vazquez's opinion. She did not address the factors identified in SSR 06-03p and 20 C.F.R. 404.1527(d), for evaluating an "other source's" opinions. The ALJ rejected Vazquez's opinion as "inconsistent with the record as a whole, and internally inconsistent."

The ALJ's conclusion that "[t]he medical evidence in this case is scant, at best"

13

appears inconsistent with Oliva's treatment record, which includes notes covering nearly three years.  These records contain numerous descriptions of Oliva's symptoms that seem to support Vazquez's assessment, such as Oliva's continued social isolation, pervasive depression, and auditory hallucinations.  *See Douglas v. Astrue*, No. 10-1152, 2010 WL 4910171, at *8 (E.D. Pa. Nov. 30, 2010) (ALJ's disregard of therapist's assessment unsupported by substantial evidence where conclusory and contradicted by record evidence); *Keiderling v. Astrue*, No. 07-2237, 2008 WL 2120154, at *4-5 (E.D. Pa. May 20, 2008) (ALJ's rejection of therapist assessment unsupported by substantial evidence where ALJ selectively interpreted medical evidence to support decision).

    The ALJ's discussion of the competing medical evidence was limited to the non-examining state agency medical consultant who, upon review of Oliva's medical records, determined that she suffered from only mild functional limitations. The ALJ weighed Vazquez's opinion against the state agency consultant's without engaging in any analysis of the comparative weight that should have been given to each assessment according to the regulations.  *See, e.g., Soto v. Astrue*, No. 08-4701, 2009 WL 2327402, at *7 (E.D. Pa. July 28, 2009 ) (Inconsistency with other opinion evidence in record insufficient basis for rejecting opinion evidence where ALJ fails to weigh opinions according to regulation factors).  Indeed, the ALJ went on to reject the state agency consultant's assessment as well, ruling that "I find that the claimant is more limited than found by this consultant." Without any analysis of these competing assessments and applying the guidelines, including the nature and length of the treatment relationship, 20 C.F.R. 404.1527(d), or any factual explanation, we are unable to determine whether the ALJ's analysis is supported by substantial evidence. *See Soto*, 2009 WL 2327402, at *7 ("Naturally, the differing

14

opinions are mutually inconsistent; the ALJ could just as easily have rejected the examining physician and medical consultant's opinions based on their inconsistency with the opinion of Dr. Stolz, but she inexplicably chose to reject that of Dr. Stolz.").

The ALJ's other ground for rejecting Vazquez's assessment is her assigning Oliva a GAF score of 60.  The GAF scale is used to rate an individual's psychological, social, and occupational functioning on a scale ranging from 0 to 100.  *Lozada*, 331 F. Supp. 2d at 330 n.2 (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32 (4th ed. 2000)). A GAF score ranging from 51-60 indicates "'moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers).'" *Id*.  A score from 61-70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g. occasional truancy or theft within the household)." *Id*.

The Social Security Administration ("SSA") has expressly declined to endorse the GAF scale, finding that it "does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." *Gilroy v. Astrue*, 351 F. App'x 714, 715 (3d Cir. 2009) (citing 65 Fed. Reg. 50764-65 (2000)).  Like other evidence, a GAF score may be accorded little or no weight depending upon its consistency with the other relevant evidence in the record.  *Torres v. Barnhart*, 139 F. App'x 411, 415 (3d Cir. 2005).  Despite acknowledging that the GAF scale had no evidentiary value[2], the ALJ  relies on the GAF score to reject Vazquez's assessment, stating a GAF score of 60 was inconsistent with

---

[2]  The ALJ prefaced her evaluation of Vazquez's assessment with the statement "[the GAF score] has no direct bearing on mental impairment evaluation under Social Security disability evaluation criteria."

Vazquez's assessment.

Because the ALJ did not address Oliva's full treatment record or weigh Vazquez's assessment according to SSA guidelines, we cannot determine if the decision to reject Vazquez's assessment in its entirety is supported by substantial evidence.  The ALJ's conclusions may be supported by the record, but we are unable to make this call.

Vocational Hypothetical

Oliva claims that the ALJ's decision was erroneous because it relied on the response to the hypothetical question posed to the vocational expert that failed to include all of her relevant mental limitations.  The parties' dispute is over the words "often" and "moderate."  Oliva argues they are synonymous.  The Commissioner contends they have different meanings and may not be used interchangeably.

A vocational expert's opinion on a claimant's ability to perform alternative employment may be considered in the disability determination only if the ALJ's hypothetical accurately portrays the claimant's physical and mental impairments.  *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).  The hypothetical question must encompass all of a claimant's significant limitations that are supported by the record.  *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004).  When presenting a hypothetical, specificity with respect to a claimant's clearly established limitations is required.  *Id*. at 554-55.

The hypothetical must include the claimant's limitations in light of the paragraph B factors in Listing 12.04.  *Id*. at 554.  In *Ramirez*, the ALJ's hypothetical to the vocational expert limited the  claimant to "simple one to two step tasks," *id.* at 549, but did not include her own findings that the claimant "often" suffered from "deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner."  *Id*. at 552

16

(internal quotations omitted).  The court held that "a requirement that a job be limited to one to two step tasks . . . does not adequately encompass a finding that [the claimant] 'often' has 'deficiencies in concentration, persistence, or pace."  Id. at 554 (internal quotations omitted).

Oliva argues that the ALJ's hypothetical fails to account for the ALJ's own determination that Oliva suffered from mild restrictions of activities of daily living; moderate difficulties in social functioning; and moderate limitations in concentration, persistence, or pace.  Citing *Ramirez*, she claims that the hypothetical is deficient and cannot constitute substantial evidence.  The Commissioner, on the other hand, contends that the *Ramirez* specificity requirement is limited to instances where the record demonstrates that the claimant "often" suffers from mental limitations and here the ALJ found only "mild" and "moderate" limitations.

Whether *Ramirez*'s specificity requirement applies when an ALJ has found a claimant suffering from "moderate" limitations as opposed to "often" suffering from limitations is subject to debate in this Circuit.  Because we are remanding for other reasons, we decline to enter the debate.  On remand, the ALJ may want to include within a hypothetical to the vocational expert findings regarding Oliva's concentration, persistence, pace and social functioning.

## Conclusion

Because we are unable to determine whether the ALJ's decision is supported by substantial evidence, we shall remand this case.